IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAFIQ ALHAMI, et *al.* )<br><br>Plaintiff Rafiq Alhami )<br><br>-Against- )<br><br>DONALD RUMSFELD )<br>Former Secretary of Defense )<br><br><br>AIR FORCE GENERAL RICHARD MYERS )<br>Former Chairman, Joint Chiefs of Staff )<br><br>ARMY MAJOR GENERAL GEOFFREY MILLER)<br>Former Commander, Joint Task Force )<br>Guantanamo Bay Naval Base, )<br><br>ARMY GENERAL JAMES T. HILL )<br>Former Commander, Joint Task Force, )<br>Guantanamo Bay Naval Base, )<br><br><br>ARMY MAJ GEN MICHAEL E. DUNLAVEY )<br>Former Commander, Joint Task Force )<br>Guantánamo Bay Naval Base, Cuba )<br><br><br>ARMY BRIGADIER GEN JAY HOOD )<br>Commander, Joint Task Force, GTMO )<br>Guantánamo Bay Naval Base, Cuba )<br><br><br>MARINE BRIG GEN MICHAEL LEHNERT )<br>Commander, Joint Task Force-160 )<br>Guantánamo Bay Naval Base, Cuba )<br><br><br>REAR ADMIRAL HARRY B. HARRIS )<br>Former Commander JTF-GTMO )<br>) | Civil Action No. |

1

Rear Admiral Mak H. Buzby                          )
Former Commander JTF-GTMO                          )
                                                   )
REAR ADMIRAL DAVID M. THOMAS, JR.                  )
Commander JTF-GTMO                                 )
                                                   )
REAR ADMIRAL JAMES G. STAVRIDIS                    )
Commander                                          )
United States Southern Command                     )
                                                   )
ARMY LT. GENERAL McNEILL                           )
Former XVIII-Corps Commander                       )
                                                   )
ARMY GENERAL TOMMY FRANKS                          )
Former Commander                                   )
United States Central Command                      )
                                                   )
ARMY BRIGADIER GENERAL                             )
GREGORY ZANETTI                                    )
Deputy Commander JTF-GTMO                          )
                                                   )
ARMY COLONEL NELSON J. CANNON                      )
Commander, Camp Delta                              )
Guantánamo Bay Naval Base, Cuba                    )
                                                   )
                                                   )
ARMY COLONEL TERRY CARRICO                         )
Commander, Camp X-Ray, Camp Delta                  )
Guantánamo Bay Naval Base, Cuba                    )
                                                   )
                                                   )
ARMY LT. COLONEL WILLIAM CLINE                     )
Commander, Camp Delta                              )
Guantánamo Bay Naval Base, Cuba                    )
                                                   )
                                                   )
ARMY LT. COLONEL DIANE BEAVER                      )
Legal Advisor to General Dunlavey                  )
Guantánamo Bay Naval Base, Cuba                    )
                                                   )
                                                   )
CAPTAIN CAROLYN WOOD                               )
Company Commander                                  )
Headquarters and Operations Company                )
519th Military Intelligence Battalion              )
                                                   )

GEORGE TENET )
Former Director of Central Intelligence )
United States Central Intelligence Agency )
                                          )
ROBERT M. GATES )
United States Secretary of Defense )
                                          )
And )
                                          )
JOHN DOES 1-100, Individuals Involved in the )
Illegal Torture and Mistreatment of Plaintiff )
  Rafiq Alhami )
At the Three Dark Sites in Kabul, )
The Bagram Air Force Base and )
Guantánamo Bay Naval Base )
                                          )
All in their personal capacities )
                                          )
And )
                                          )
THE DEPARTMENT OF DEFENSE OF )
       THE UNITED STATES )
                                          )
And )
                                          )
THE UNITED STATES OF AMERICA )

# COMPLAINT

Plaintiff Rafiq Alhami, by and through his undersigned attorneys, Denbeaux &

Denbeaux, as and for his complaint against Defendants Donald Rumsfeld, Air Force General

Richard Myers, Army Major General Geoffrey Miller, Army General James T. Hill, Army Major

General Michael E. Dunlavey, Army Brigadier General Jay Hood, Marine Brigadier General

Michael Lehnert, Rear Admiral Harry B. Harris, Navy Rear Admiral Mark H. Buzby, Rear

Admiral David M. Thomas, Jr., Rear Admiral James G. Stavridis, Army Lt. General Ricardo

Sanchez, Army General Tommy Franks, Army Brigadier General Gregory Zanetti, Army

Colonel Nelson J. Cannon, Army Colonel Terry Carrico, Army Lieutenant Colonel William

Cline, Army Lieutenant Colonel Diane Beaver, Captain Carolyn Wood, John Does 1-100, the Department of Defense of the United States of America and the United States of America, hereby alleges as follows:

## INTRODUCTION

1.      Plaintiff Rafiq Alhami is detained at the Guantánamo Bay Naval Station in Cuba. He is not, nor has he ever been, a member of any terrorist group. He has never taken up arms against the United States or its allies.

2.      Plaintiff Rafiq Alhami was imprisoned by United States forces in Afghanistan from December 2001 until January 2003. He was held first in three different Central Intelligence Agency ("CIA") "Dark Sites" in Kabul:  Wazir Akbar Khan, the "Salt Pit," and the Prison of Darkness. He was then transferred to Bagram for further detention.

3.      Thereafter, Plaintiff Rafiq Alhami was transferred to the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo"), where Defendants imprisoned him without charge for what has now been six (6) years.

4.      During Plaintiff Rafiq Alhami's imprisonment, Defendants have systematically and repeatedly tortured him in violation of the United States Constitution and federal and international law, and have deprived him of access to friends, relatives, courts and counsel. Defendants repeatedly attempted to extract confessions from Plaintiff Rafiq Alhami (without regard to truth or plausibility) through the use of illegal methods detailed below but have also abused him for reasons apparently unconnected with any interrogative purpose.

5.      In the course of Plaintiff Rafiq Alhami's detention by the United States, he was repeatedly struck with rifle butts, punched, kicked and slapped. He was "short shackled" in painful "stress positions" for many hours at a time, as well as long shackled, causing deep flesh

4

wounds and permanent scarring. Plaintiff Rafiq Alhami was also: threatened with un-muzzled dogs; subjected to repeated forced body cavity searches; intentionally subjected to extremes of heat and cold for the purpose of causing suffering; kept in filthy cages for twenty-four (24) hours per day with no exercise or sanitation; denied access to necessary medical care; harassed for practicing his religion; deprived of communication with family and friends; deprived of access to counsel; subjected to sleep disorientation and sleep deprivation; placed in "the dog box" until edema became life-threatening; held in prisons while other prisoners were murdered; threatened with death; made to stand in a room that was four and a half feet high while chained to a pole four feet off the ground, forcing him into a crouched position for hours at a time; subjected to extremes of light and dark for weeks at a time; kept without clothes or blankets in cold cells; repeatedly stripped naked in front of females; "ERFed" repeatedly (as explained below); force fed; starved; sexually abused; sprayed with pepper-spray on his hemorrhoids and in his eyes; and denied the right to pray, wash, and otherwise comply with his religion.

6.    These acts occurred both in CIA facilities and in military facilities in Afghanistan and Guantánamo. They were committed during as well as outside of interrogations. They occurred both before and after the United States Supreme Court's decisions in *Rasul v. Bush*, 542 U.S. 466 (2004) and *Boumediene v. Bush*, 128 S. Ct. 2229 (2008).

7.    Plaintiff Rafiq Alhami's detention and mistreatment were committed in violation of the United States Constitution, federal statutory law, United States treaty obligations, and customary international law, sometimes called the law of nations. Defendants' continued mistreatment of Plaintiff Rafiq Alhami and other Guantánamo detainees violates multiple provisions of law, including: the Fifth Amendment of the United States Constitution forbidding deprivation of liberty without due process; the Eighth Amendment forbidding cruel and unusual

punishment; United States statutes prohibiting torture, assault, sexual abuse, conspiracy, and other mistreatment; the Geneva Conventions; and customary international law norms prohibiting torture and other cruel, inhuman or degrading treatment.

8.     The torture and other mistreatment suffered by Plaintiff Rafiq Alhami was not simply the product of isolated or rogue actions by individual military personnel. Rather, Plaintiff Rafiq Alhami's suffering was the foreseeable result of deliberate action taken by Defendant Rumsfeld and other defendants to flout or evade not only the United States Constitution, but also federal statutory law, United States treaty obligations, and long-established norms of customary international law. This action was taken in an ill-conceived and illegal attempt to utilize torture and other cruel, inhuman or degrading acts to coerce Plaintiff and other detainees into providing often highly inaccurate information regarding terrorism.   It was ill-conceived because— according to the United States military (as expressed in Army Field Manual 34-58)—torture does not yield reliable information, as well as because Plaintiff Rafiq Alhami , along with the vast majority of Guantánamo detainees, had no information to give.   It was illegal because, as Defendants knew or should have known, torture and other cruel, inhuman or degrading treatment of detainees is prohibited under the United States Constitution, federal statutory law, United States treaty obligations, and customary international law.

9.     On or about December 2, 2002, Defendant Rumsfeld signed a memorandum approving numerous illegal interrogation methods, including that detainees may be put in "stress positions" for up to four (4) hours; forced to strip naked; intimidated with dogs; interrogated for twenty (20) hours at a time; forced to wear hoods; shaved of their hair and beards; kept in total darkness and silence; and be made to endure what was euphemistically called "mild, non-injurious physical contact."   As Defendant Rumsfeld knew, these and other methods were in

6

violation of the United States Constitution, federal statutory law, the Geneva Conventions, and customary international law as reflected in, *inter alia*, The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). This memorandum of December 2, 2002, authorizing torture and other mistreatment, was originally designated by Defendant Rumsfeld to be classified for ten (10) years, but was released at the direction of President George W. Bush after the Abu Ghraib torture scandal became public.

10.     After authorizing, encouraging, permitting and requiring the acts of torture and other mistreatment inflicted upon Plaintiff Rafiq Alhami, Defendant Rumsfeld, on information and belief, subsequently commissioned a "Working Group Report" dated March 6, 2003, to address "Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations." This report, also originally classified for a period of ten (10) years by Defendant Rumsfeld, was released after the Abu Ghraib torture scandal became public. This report details the requirements of international and domestic law governing interrogations, including the Geneva Conventions; the CAT; customary international law; the torture statute, 18 U.S.C. §2340; assault within maritime and territorial jurisdiction, 18 U.S.C. §113; maiming, 18 U.S.C. §114; murder, 18 U.S.C. §1111; manslaughter, 18 U.S.C. §1112; interstate stalking, 18 U.S.C. §2261a; and conspiracy, 18 U.S.C. §2 and §371. The report attempts to address "legal doctrines under the Federal Criminal Law that could render special conduct, otherwise criminal *not* unlawful." Working Group Report at p. 3 (emphasis in original). The memorandum is on its face an ex post facto attempt to justify the facially criminal acts perpetrated by the Defendants. It argues that the President as Commander-in-Chief has plenary authority to order torture, a proposition that ignores settled legal doctrine from King John at Runnymede to *Youngstown Sheet & Tube*, 343 U.S. 579 (1952) and beyond. It next attempts to

apply common law doctrines of self-defense and necessity, arguing the erroneous proposition that the United States has the right to torture detained individuals because it needs to defend itself or because it is necessary that it do so. Finally, it suggests that persons inflicting torture and other mistreatment will be able to defend against criminal charges by claiming that they were following orders. The report asserts that the detainees have no Constitutional rights because the Constitution does not apply to persons held at Guantánamo. However, the report acknowledges that the United States is bound by the CAT to the extent that conduct barred by that Convention would also be prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution. On June 22, 2004, the conclusions of this report and other memoranda attempting to justify torture were repudiated and rescinded by President Bush.

11.     In April 2003, following receipt of the Working Group Report, Defendant Rumsfeld issued a new set of recommended interrogation techniques, requiring approval for four (4) specific techniques. These recommendations recognized specifically that certain of the approved techniques violated the Geneva Conventions and customary international law, including the use of intimidation, threats, removal of religious items, and isolation. The April 2003 report, however, officially withdrew approval for unlawful actions that had been ongoing for months, including hooding, forced nakedness, shaving, stress positions, use of dogs, and "mild, non-injurious physical contact." Nevertheless, on information and belief, these illegal practices continued to be employed against Plaintiff Rafiq Alhami and other detainees at Guantánamo.

12.     Defendants knew that their activities resulting in the detention, torture and other mistreatment of Plaintiff Rafiq Alhami were illegal and violated clearly established law, i.e., the United States Constitution, federal statutory law, treaty obligations of the United States, and

customary international law.   Defendants' after-the-fact attempt to create a transparently unpersuasive justification makes clear their conscious awareness that they were acting illegally. Therefore, they cannot claim immunity from civil liability.

13.     Defendants knew that the published procedures for treatment of detainees during detention and during interrogations forbid all of the mistreatment of Plaintiff Rafiq Alhami described above.  Moreover, Defendants knew or should have known that the restrictions upon mistreatment outlined in the detention procedures that were published as official policy were being systematically violated within the confines of the detention facilities. The procedures that were knowingly violated include:  Army Field Manual 27-10; Army Field Manual 34-52; Army Field Manual 2-22.3; the Camp Delta Standard Operating Procedures for Guantánamo; and the President's Military Order dated November 19, 2001

14.     Defendants have insisted upon procedures contained in the protective order governing attorney access to clients that require that counsel's notes from interviews with the client be taken from counsel and reviewed to ensure that they do not contain classified information. After such clearance review the notes are to be returned to counsel. The order does not permit the Department of Defense to review the notes or to control release for any other reasons than to protect classified evidence.  The defendants in this case have intervened to prevent the release of detainees' complaints about mistreatment.  In doing so the defendants have breached the attorney client privilege and violated their obligation under the protective order and in order to cover up their misconduct

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over Plaintiff Rafiq Alhami's claims under 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §1346(b)(1) (Federal Tort Claim Act), 28 U.S.C.

§1350 (Alien Tort Statute), and 28 U.S.C. §2680(h) (reaffirming jurisdiction over actions for assault, battery, false imprisonment, etc. under 28 U.S.C. §1350.

16.    Since Plaintiff Rafiq Alhami incarceration is neither "awaiting sentencing nor serving a sentence," his claims are is not within the exception to jurisdiction under 1346(b)(2).

17.    With respect to any claims which occurred after Plaintiff Rafiq Alhami reached Guantanamo, the exception in 28 U.S.C. §2680(k) for jurisdiction under §1346(b)(1) for claims arising in a "foreign country" is inapplicable given the special legal status of the Guantanamo Naval Base.

18.    With respect to all claims but certainly with respect to any claims which occurred after Plaintiff Rafiq Alhami reached Guantanamo, the exception in 28 U.S.C. §2680(j) for jurisdiction under §1346(b)(1) for claims "arising out of combatant activities of the military or naval forces... during time of war,""foreign country" is inapplicable.

19.    Venue is proper in this district pursuant to 28 U.S.C. §1391, §1346.

## PARTIES

20.    Plaintiff Rafiq Alhami is a citizen of Tunisia.

21.    All individuals named herein as defendants are sued in their individual capacities.

22.    Defendant Donald Rumsfeld was formerly the United States Secretary of Defense.  On information and belief, he is a resident of Illinois  Defendant Rumsfeld was charged with maintaining custody and control of the Guantánamo detainees, including Plaintiff Rafiq Alhami, and with assuring that their treatment was in accordance with the law.  Defendant Rumsfeld ordered, authorized, condoned, and is legally responsible for the arbitrary detention, torture and other mistreatment of Plaintiff Rafiq Alhami as alleged herein.  Defendant Rumsfeld is sued in his individual capacity.

23.     Defendant Robert Gates is the United States Secretary of Defense.   On information and belief, he is a resident of the District of Columbia.  Defendant Gates was charged with maintaining custody and control of the Guantánamo detainees, including Plaintiff Rafiq Alhami, and with assuring that their treatment was in accordance with the law.  Defendant Gates is sued in his individual capacity.

24.     Defendant George Tenet was the Director of the Central Intelligence Agency from July 1997 to July 2004, including times relevant to the detention of Plaintiff Rafiq Alhami in Afghanistan.  On information and belief,  he is a citizen and resident of Maryland.   He is responsible for maintaining the custody of those detained in CIA facilities. On information and belief, he is a citizen and resident of New York. Defendant Tenet is sued in his individual capacity.

25.     Defendant Myers was a General in the United States Air Force and was at times relevant hereto Chairman of the Joint Chiefs of Staff.  He is retired. On information and belief, he is a citizen and resident of Virginia.  As the senior uniformed military officer in the chain of command, Defendant Myers was charged with maintaining custody and control of the Guantánamo detainees, including Plaintiff Rafiq Alhami and with assuring that their treatment was in accordance with the law.  On information and belief, Defendant Myers was informed of and condoned torture and other mistreatment of detainees at Guantánamo and at the Abu Ghraib prison in Iraq.  Defendant Myers was at relevant times in regular contact with Defendant Rumsfeld, and participated in and implemented decisions taken in the District of Columbia. Defendant Myers is sued in his individual capacity.

26.     Defendant Miller was a General in the United States Army and was at times relevant hereto Commander of Joint Task Force-GTMO.  On information and belief, he is a

11

resident of Texas.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law.  On information and belief, Defendant Miller was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Miller participated in and implemented decisions taken in the District of Columbia, including, on information and belief, the decision to implement and condone numerous methods of torture and other mistreatment as hereinafter described.  On information and belief, Defendant Miller was subsequently transferred to Abu Ghraib, where he implemented and facilitated torture and other mistreatment of detainees there.  These acts were filed and photographed, and have justly inspired widespread revulsion and condemnation around the world.  Defendant Miller is sued in his individual capacity.

27.    Defendant Hill was a General in the United States Army and was at times relevant hereto Commander of the United States Southern Command. On information and belief, he is a citizen and resident of Texas.  On information and belief, Defendant Hill was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia.  Defendant Hill participated in and implemented decisions taken in the District of Columbia.  On information and belief, for example, Defendant Hill requested and recommended approval for several abusive interrogation techniques that were used on Guantánamo detainees, including Plaintiff Rafiq Alhami.   Defendant Hill is sued in his individual capacity.

28.    Defendant Dunlavey was a Major General in the United States Army and was at times relevant hereto Commander of Joint Task Forces 160/170, the successor to Joint Task Force-GTMO. On information and belief, he is a citizen and resident of Pennsylvania.  At times

relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law.  On information and belief, Defendant Dunlavey was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  On information and belief, Defendant Dunlavey implemented and condoned the torture and other cruel, inhuman and degrading acts and conditions alleged herein.  Defendant Dunlavey is sued in his individual capacity.

29.     Defendant Hood is a Brigadier General in the United States Army and is Commander of Joint Task Force-GTMO, which at all relevant times operated the detention facilities at Guantánamo.  On information and belief, he is a citizen and resident of Florida.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law.  On information and belief, Defendant Hood has been and continues to be in regular contact with the Secretary of Defense and other senior officials in the chain of command based in the District of Columbia, and participated in and implemented decisions taken in the District of Columbia.  Defendant Hood is sued in his individual capacity.

30.     Defendant Michael Raymond Lehnert is a Brigadier General in the United States Marine Corps and was at times relevant hereto Commander of Joint Task Force responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo.  On information and belief, he is a citizen and resident of Michigan.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law.  On information and belief,

13

Defendant Lehnert was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Lehnert participated in and implemented decisions taken in the District of Columbia. Defendant Lehnert is sued in his individual capacity.

31. Defendant Vice Admiral Harry B. Harris was formerly the Commander of Joint Task Force Guantánamo, and is currently Deputy Chief of Naval Operations for Communication Networks, as well as Chief Information Officer of the Deputy Department of the Navy. On information and belief, he is a citizen and resident of Florida. On information and belief, Defendant Harris was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Harris participated in and implemented decisions taken in the District of Columbia. Defendant Harris is sued in his individual capacity.

32. Defendant Navy Rear Admiral Mark H. Buzby was formerly Commander of Joint Task Force Guantánamo, and is currently Deputy Chief of Staff for Global Force Management and Joint Operations, United States Fleet Forces Command. On information and belief, Defendant Buzby was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Buzby participated in and implemented decisions taken in the District of Columbia. Upon Information and belief Defendant Buzby is a resident of New Jersey. Defendant Buzby is sued in his individual capacity.

33. - Defendant Rear Admiral David M. Thomas, Jr. is Commander of Joint Task Force Guantánamo. On information and belief, Defendant Thomas was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of

14

Columbia. Defendant Thomas participated in and implemented decisions taken in the District of Columbia. Defendant Thomas is sued in his individual capacity.

34.     Defendant Rear Admiral James G. Stavridis is Commander of the United States Southern Command.  Upon information and belief, he is a citizen and resident of Florida.  On information and belief, Defendant Stavridis was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia.  Defendant Stavridis participated in and implemented decisions taken in the District of Columbia. Defendant Stavridis is sued in his individual capacity.

35.     Defendant Army Lieutenant General Ricardo Sanchez was the Commander of the Bagram detention facility during 2002 and 2003, and was the V-Corps Commander of Coalition Forces in Iraq from June 2003 to June 2004.  On information and belief, he is a citizen and resident of Texas. On information and belief, Defendant Sanchez was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Sanchez participated in and implemented decisions taken in the District of Columbia. Defendant Sanchez is sued in his individual capacity.

36.     Defendant  Lieutenant  General  Tommy  R.  Franks  was  the  Commander  of Afghanistan during the years 2001-2003. On information and belief, he is a citizen and resident of Oklahoma.   On information and belief, Defendant Franks was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Franks participated in and implemented decisions taken in the District of Columbia. Defendant Franks is sued in his individual capacity.

37.     Defendant Army Brigadier General Gregory Zarnneti is Commander of Joint Task Force Guantánamo.  On information and belief, Defendant Zanetti was in regular contact with

15

Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Zanetti participated in and implemented decisions taken in the District of Columbia. Upon information and belief, Defendant Zarretti is a resident of New Jesery. Defendant Zanetti is sued in his individual capacity.

38.    Defendant Cannon is a Colonel in the United States Army and the Commander of Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Michigan. At times relevant hereto, he has had and continues to have supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law. On information and belief, Defendant Cannon was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Cannon is sued in his individual capacity.

39.    Defendant Carrico is a Colonel in the United States Army and was at times relevant hereto Commander of Camp X-Ray and Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Georgia. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiff Rafiq Alhami, and was responsible for assuring that their treatment was in accordance with the law. On information and belief, Defendant Carrico was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Carrico participated in and implemented decisions taken in the District of Columbia. Defendant Carrico is sued in his individual capacity.

40.    Defendant Army Lieutenant Colonel William Cline was Commander of Camp Delta, Guantánamo. On information and belief, Defendant Cline was in regular contact with

16

Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Cline participated in and implemented decisions taken in the District of Columbia. Defendant Cline is sued in his individual capacity.

41.     Defendant Beaver is a Lieutenant Colonel in the United States Army and was at times relevant hereto Chief Legal Adviser to Defendant Dunlavey. On information and belief, she is a citizen and resident of Missouri. On information and belief, Defendant Beaver, knowing that torture and other mistreatment were contrary to military law and regulations, nevertheless provided an opinion purporting to justify the ongoing torture and other mistreatment of detainees at Guantánamo, including Plaintiff Rafiq Alhami. On information and belief, Defendant Beaver was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Beaver is sued in her individual capacity.

42.     Captain Carolyn Wood is Company Commander of the Headquarters and Operations Company of the 519th Military Intelligence Battalion. On information and belief, she is a citizen and resident of Georgia. On information and belief, Defendant Wood was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia. Defendant Wood participated in and implemented decisions taken in the District of Columbia. Defendant Wood is sued in her individual capacity.

43.     Because procedures governing the detention facilities required that individuals such as Defendants John Does 1-100 neither wear name tags nor reveal any other identifying features (such as numbers), it is not possible to identify the other Defendants sued herein and therefore these defendants are identified by fictitious names, John Does 1-100. Plaintiff Rafiq Alhami will amend this complaint to allege true names and capacities when ascertained. John

17

Does 1-100 are the military and civilian personnel who participated in the torture and other mistreatment of Plaintiff Rafiq Alhami as hereinafter alleged.

44.     Defendant United States Department of Defense is a department of the Government of the United States of America

45.     Defendant United States of America is a sovereign nation.

## FACTUAL ALLEGATIONS

46.     Plaintiff Rafiq Alhami was born in Tunisia but cannot return to the country of his birth. This is due to the fact that, after the United States persuaded the Tunisian government to pass the Tunisian Patriot Act in 2003, Plaintiff Rafiq Alhami was tried in absentia for violation of the Act, based solely upon information provided by the United States to justify Plaintiff Rafiq Alhami detention as an enemy combatant. Plaintiff Rafiq Alhami was convicted of violating the Tunisian Patriot Act. This conviction was ex post facto since Plaintiff had been detained by the United States for two years before the Tunisian Patriot Act was passed.

47.     Plaintiff Rafiq Alhami was not an enemy combatant, a terrorist, a criminal, or a threat to the United States. Plaintiff Rafiq Alhami never conducted any terrorist activity or conspired, intended, or planned to conduct any such activity. Plaintiff Rafiq Alhami never belonged to Al-Qaeda or any other terrorist organization.

48.     Defendants United States and the Department of Defense now know this to be true and have known it for several years.

49.     The United States approved Plaintiff Rafiq Alhami for release but specified that he be released only to Tunisia—and only after it had arranged for the Tunisian government to convict Plaintiff Rafiq Alhami under an ex post factor law using only the very evidence that the United States had determined did not warrant further detention.

### Detention in Afghanistan

50.     In November 2001, Plaintiff Rafiq Alhami was arrested in Iran, where he was moved from one jail to another over a period of weeks.

51.     No United States forces, nor any United States intelligence agency personnel, were present during this period of Plaintiff Rafiq Alhami's detention. At this time, there were no sources of information regarding Plaintiff Rafiq Alhami other than what was supplied by the Iranian Government. Plaintiff Rafiq Alhami (a Sunni) was initially turned over to the Iranian government by an Iranian citizen (a Shiite)—apparently for a bounty.

52.     In December 2001, the CIA and other United States forces were informed by Iran of Plaintiff Rafiq Alhami detention. Iran offered Plaintiff Rafiq Alhami to the CIA in exchange for benefits not presently known. Subsequently, the CIA negotiated with Iran to have Plaintiff Rafiq Alhami turned over to the CIA in Kabul, and the CIA arranged to have the Afghan air force transfer Plaintiff Rafiq Alhami, along with nine (9) others from Iran to the first of three (3) "Dark Sites" in Kabul.

53.     Plaintiff Rafiq Alhami was met at the Kabul Airport by American civilians and then disappeared for more than one year. His presence and his existence were unknown to everyone except his United States detainers. He had no communication with the outside world, was unknown to the International Red Cross and was not included on any publically available list of individuals being arrested or detained. His family did not know where he was; he did not know where he was and he had no communication with anyone other than his detainers. He was told that no one knew where he was; that he would be secretly detained for 20 years, perhaps until his death and no one would ever know.

54.     During the flight to Kabul, Plaintiff Rafiq Alhami was handcuffed and chained to the floor of the plane. A burlap bag was put over his head.

55.     Plaintiff Rafiq Alhami was at all times hooded, with black goggles, shackled hands and feet, and had the ability only to shuffle along blindly. Plaintiff could, however, hear and recognize language, voices, and accents. Plaintiff Rafiq Alhami was placed in a van and taken for a brief ride from the airport to one of two CIA "Dark Sites": either Wazir Akbar Khan or the "Salt Pit."

56.     Just as Ramadan was beginning, Plaintiff Rafiq Alhami was moved to the Prison of Darkness.

57.     Neither when Plaintiff Rafiq Alhami was picked up in Iran by the Afghan air force, nor when he arrived in Kabul, did the CIA, Defense Department, or any United States forces have any evidence against Plaintiff Rafiq Alhami or any basis for his detention.

### *Interrogations at the CIA Dark Sites*

58.     Interrogators at the CIA Dark Sites sought to obtain from Plaintiff Rafiq Alhami information about Iran. Plaintiff knew nothing about Iran, however, apart from his detention in three Iranian jails.

59.     Subsequently, CIA interrogators forced Plaintiff Rafiq Alhami to confess that he had been in the Khalden training camp for ten (10) days during which time he was trained on anti-aircraft weapons—even though most of Plaintiff Rafiq Alhami's (dominant) left hand had been severely damaged as a result of carpentry accident that had occurred years before and which would have made him unable to perform such duties.

60.     After Plaintiff Rafiq Alhami's detention in the three (3) different CIA facilities, he was flown to the Bagram Air Force base, and then taken to Guantánamo in January 2003.

61.     In all three (3) Kabul Dark Sites, American civilians were in charge.

62.     Plaintiff Rafiq Alhami does not know how often or for how long he was interrogated.

63.     The interrogations at the Prison of Darkness were by far the worst.

64.     In Plaintiff Rafiq Alhami's first interrogation at the political prison, Wazir Akbar Khan, one interrogator had a pistol, and another had a rifle. The weapons were directed at Plaintiff Rafiq Alhami's face. One of the guns was an M-16. The interrogator behind him also had a gun. All of the interrogators were Americans in civilian clothes. They kicked Plaintiff Rafiq Alhami. One of the armed interrogators was a female. The interrogators undressed Plaintiff Rafiq Alhami completely so that he was naked in front of the female interrogator. Eventually, he was given an Afghan long-shirt so that he could cover his private parts.

65.     Plaintiff Rafiq Alhami does not remember exactly what he was asked except a great deal of the questioning regarded Iran. He did not know what was going on at the time, but was scared and embarrassed. He believed the Americans when they told him that they had brought guns because they were going to kill him.

66.     During the questioning, Plaintiff Rafiq Alhami was totally confused and afraid for his life. He tried to answer their questions, but he did not know the answers. The interrogators threatened him over and over again.

67.     After the interrogation, Plaintiff Rafiq Alhami was returned to his cell, which was three (3) meters by three (3) meters by three (3) meters. Approximately two-thirds (2/3) of the cell was underground. There were other prisoners in the cell with him. In fact, Plaintiff Rafiq Alhami's cell was so full that it was impossible for any of the prisoners to lie down.

68.     A few weeks later, Plaintiff Rafiq Alhami was interrogated again.  Afghan guards came to pick him up, and handcuffed him.  They took him down a tunnel to the interrogation. Before he entered the room, an American brandished a gun in a very threatening manner outside of the interrogation room.  When Plaintiff Rafiq Alhami was taken into the interrogation room he saw other Americans with similar weapons.  Again there was a female in the room, although she and one of the other interrogators were apparently unarmed.  At all times, however, an individual with a weapon stood behind Plaintiff Rafiq Alhami and made noises with his gun as though he were about to shoot Plaintiff Rafiq Alhami .

69.     The presence of the person behind Plaintiff Rafiq Alhami scared him.  The interrogators told Plaintiff Rafiq Alhami: "If you don't talk, we will kill you."

70.     Plaintiff Rafiq Alhami agreed with whatever he was told by the interrogators.  If the interrogators had stated that Plaintiff Rafiq Alhami was Osama Bin Laden, he would have agreed.

### *The Salt Pit*

71.     Interrogations at the second Dark Site, known as the "Salt Pit," were similar to those conducted at the first.   Plaintiff Rafiq Alhami was again completely undressed. Interrogators, dressed in civilian clothes, always tried to scare him.  He was terrified.  Just as at the previous Dark Site, Plaintiff Rafiq Alhami could see the faces of his captors, but did not know their names.

### *Non-Interrogation Torture at the Prison of Darkness*

72.     Ramadan was just beginning when Plaintiff Rafiq Alhami entered the Prison of Darkness for approximately two (2) months, on or about November 5, 2002.  Plaintiff Rafiq

Alhami was removed from the prison after Ramadan ended with the celebration of Eid, in late December, 2002. At the prison, Americans in civilian clothes (such as jeans) were in charge.

73.     Throughout Plaintiff Rafiq Alhami's detention in the Prison of Darkness, he was prevented from praying and fasting. He was denied access to a Koran. He was denied access to a prayer rug and to a place to wash before praying. He could not kneel because he was always chained so that he was forced to either stand or crouch. He was completely disoriented, and did not know what time or day it was, or what direction his cell faced.

74.     When Plaintiff Rafiq Alhami asked for help so that he could pray, the Americans mocked him. Not everything they told him was clear, but they did tell him that his god wanted him to suffer. They also told Plaintiff Rafiq Alhami that he would not be in the prison if he believed in the "right God—Jesus Christ." They again told him that Allah wanted him to suffer, and that they were helping.

75.     Plaintiff Rafiq Alhami was held in total darkness. There was never any quiet; deafeningly loud music was played at all times.

76.     Plaintiff Rafiq Alhami's cell was unheated. His captors brought food what felt like only once every few days—though Plaintiff cannot be completely sure how often, since he was kept in complete darkness and the days ran together. There were, however, long gaps between meals, which the guards brought by flashlight.

77.     Plaintiff Rafiq Alhami's movements were always extremely limited. There were three general methods of chaining: sometimes, detainees were chained by both hands to a ring or bar in the ceiling of his cell, and by both feet to the floor; other times, their hands were chained either low to the ground (at about two feet high), or high (at about four feet).

78.     Often, Plaintiff Rafiq Alhami was handcuffed to a pole that extended across his cell wall, and forced to stand. Other times, he was tied up, with his arms bound together and fastened over his head.

79.     Guards would shine a light in to check on Plaintiff Rafiq Alhami, mockingly asking him if he could pray while tied up. Otherwise, they checked on Plaintiff only to make sure that he was still moving.

80.     Sometimes, Plaintiff Rafiq Alhami would be put in a box inside a room which was one meter by one meter by one meter. He would be held there until his legs and feet became swollen, and then he would be released.

81.     When Plaintiff Rafiq Alhami was taken out of the box, or released from the pole which held his arms above his head, he would be put into a "rest room." The rest room had a ring fastened into the cement wall about two (2) feet off the ground; one of Plaintiff Rafiq Alhami's hands would be fastened to the ring in the wall. In the "rest room," he could doze off from time to time.

82.     Plaintiff Rafiq Alhami often had no clothes, and did not have shoes.

83.     Because Plaintiff Rafiq Alhami lacked adequate clothing and his cement cell was partially below ground and unheated, he was very cold.

84.     Plaintiff Rafiq Alhami could only go to the bathroom when he was brought a bucket by the guards, who watched and mocked him as he used it. He was never allowed to wash, so that he could not pray. He was unable to know which side of his cell faced Mecca. He was dirty, unwashed and humiliated. In order to avoid soiling himself further, he would not eat or drink.

85.     Plaintiff Rafiq Alhami was always hungry.

### Prison of Darkness: Interrogation Treatment

86.   In the Prison of Darkness, Plaintiff Rafiq Alhami was very ill.

87.   He was taken out of his cell for interrogation. He was shackled, hooded, and forced to wear black goggles. He could not see how many people were in the room, but could hear several different voices.

88.   During one of his interrogations in the Prison of Darkness, an American and an interpreter with a Syrian accent questioned him. They promised to kill Plaintiff Rafiq Alhami, telling him: "We are going to hand you to certain group who will kill you. Who should we give your body to afterwards?"

89.   In Plaintiff Rafiq Alhami's last interrogation there were only an interrogator, an assistant, and an interpreter present. He knew that they were American men.

### Disappearance in Kabul, Afghanistan

90.   Plaintiff Al Hami' disappeared into the Dark Sites of Kabul. During the months he was detained at the three Dark Sites in Kabul he did not exist for the purposes of the International Red Cross. His name was not recorded; his family and acquaintances did not know where he was; he had no lawyer and no access to any information or other assistance. He was held in total secrecy. Plaintiff was "disappeared."

91.   In Plaintiff Rafiq Alhami's last interrogation there were only an interrogator, an assistant, and an interpreter present. He knew that they were American men.

### Non-Interrogation Treatment at Bagram

92.   Plaintiff Rafiq Alhami was ill and very weak when he was removed from the Prison of Darkness to Bagram. For two days, he was prevented from sitting or sleeping.

93. Plaintiff Rafiq Alhami was put into a wooden box, like a dog box. It looked like a wooden box with chain link ("net fence") on the top. Plaintiff was cold.

94. While Plaintiff Rafiq Alhami was in Bagram, at least one other detainee, a taxi driver, was murdered. The Oscar award winning documentary, *Taxi to the Darkside*, tells the story of the taxi driver who was murdered in Bagram while Plaintiff Rafiq Alhami was being held there. Plaintiff Rafiq Alhami was on the first floor of the prison, while the taxi driver was on the second floor.

95. Military officials came to Guantánamo to ask Plaintiff Rafiq Alhami if he had seen the face of Dilawar, the prisoner who had been murdered. Plaintiff Rafiq Alhami did not recognize the photograph.

### *Interrogations at Bagram*

96. The interrogations in Bagram were always conducted by American military officials in uniform. They were sometimes accompanied by civilians.

97. Bagram interrogations led to the deaths of two detainees who were being "prepared" for interrogations. The question of the limits upon interrogations was apparently a sore subject among American officials there.

98. Captain Carolyn Wood was in charge of the Military Intelligence unit in Bagram. She repeatedly sent e-mails to Lt. General McNeill asking how the interrogations would be performed, and what limits were applicable. She never received a single written response from General Sanchez or any other person. After awhile, she began conducting interrogations without guidance, and later sent a series of e-mails describing the interrogation methods that she was using.

99.   Lt. General McNeill never responded to her descriptions of the interrogation methods that she was using.

100.   Soldiers who were part of Carolyn Wood's Military Intelligence unit were court marshaled and convicted of the mistreatment of Dilawar which caused his death.

101.   Plaintiff Rafiq Alhami was subjected to the same treatment designed to provoke sleep deprivation.  Fortunately for Plaintiff, he did not die.

102.   American soldiers cut off his clothes and conducted body cavity searches.

103.   When his interrogation at Bagram began, Plaintiff Rafiq Alhami was led through an open-air maze constructed of barbed wire.  Plaintiff—dehydrated, exhausted, disoriented, fearful and shackled—was led to an interrogation tent.  His hood was removed and he was told to sit on the floor.  An armed soldier stood behind him, out of his line of sight.  He was told that if he moved he would be shot.

104.   After answering questions as to his background, Plaintiff Rafiq Alhami was photographed by soldiers.  He was fingerprinted, and a swab sample from his mouth and hairs plucked from his beard were taken, presumably for DNA identification.

105.   An American soldier questioned Plaintiff Rafiq Alhami.  He falsely accused Plaintiff of being a member of Al-Qaeda.  Defendants John Does, United States soldiers, punched and kicked Plaintiff in the back and stomach before he was dragged to another tent.

106.   During the interrogation, Plaintiff Rafiq Alhami was threatened by armed Defendants John Does with further beatings if he did not admit to various false statements.

107.   After the interrogation, Plaintiff Rafiq Alhami was not allowed to talk and was forced to sleep on the ground.  American soldiers woke Plaintiff Rafiq Alhami hourly as part of a systematic effort to deprive him of sleep.

108.    Defendants John Does, interrogators as well as guards, frequently used physical violence and un-muzzled dogs to threaten and intimidate Plaintiff Rafiq Alhami and other detainees during the interrogations.

109.    In January 2003, Plaintiff Rafiq Alhami was given another body cavity search and photographed extensively while naked before being given an orange uniform.    Soldiers handcuffed Plaintiff Rafiq Alhami's wrists and ankles before dressing him in black thermal gloves, dark goggles, earmuffs, and a facemask.  Plaintiff was then left for hours in freezing temperatures. Distraught, fearful of further beatings, abuse, and without benefit of contact with family or counsel, Plaintiff Rafiq Alhami repeated the same false confessions.

110.    Plaintiff Rafiq Alhami was transported to Guantánamo.

111.    Prior to take-off, Plaintiff Rafiq Alhami was hooded and shackled; mittens were placed on his hands, and earphones over his ears.  Chains were then placed around his legs, waist and earphones.  The chains cut into his ears.  Goggles were placed on his eyes.  A medical patch that was applied, on information and belief, contained muscle relaxant.

112.    Plaintiff Rafiq Alhami was escorted onto a large cargo plane.  Still shackled and wearing a facemask, he was chained to the floor with no backrest.  He was forced by Defendant John Doe to sit in this uncomfortable position for the entire flight to Guantánamo (approximately 18 to 20 hours) and was neither allowed to move nor given access to toilet facilities.

113.    During the trip, Defendants John Does, United States Soldiers, kicked and punched Plaintiff Rafiq Alhami more than twenty (20) times.  Plaintiff Rafiq Alhami was also elbowed repeatedly, and was continually threatened with more violence.

## *Pre-*Boumediene *Treatment at Guantánamo*

114.    Upon arrival at Guantánamo, Plaintiff Rafiq Alhami was placed on a barge for transport to the main camp.  Defendants John Does, United States Marines on the barge, repeatedly beat Plaintiff Rafiq Alhami —kicking, slapping, elbowing and punching him and other detainees on the body and head. The Marines announced repeatedly: "You are arriving at your final destination"; "You are now property of the United Stated Marine Corps"; "No one knows that you are here; no one will ever know where you are"; and "You are dead to your family."

115.    Un-muzzled, barking dogs were used to intimidate Plaintiff Rafiq Alhami and others.  At one point, Defendant John Doe, a soldier from a unit known as the Extreme Reaction Force (ERF) repeatedly kicked Plaintiff Rafiq Alhami in the back and used a riot shield to slam him against a wall.

116.    Plaintiff Rafiq Alhami was forced to sit in his cell in total silence for extended periods. Once a week, Plaintiff was removed from his cage and showered.  He was then returned to his cell. Once a week, Plaintiff Rafiq Alhami was permitted five (5) minutes of "recreation" while his hands remained chained.

117.    Plaintiff Rafiq Alhami was constantly threatened, with guards stating on multiple occasions, "We could kill you at any time; the world doesn't know you're here; we could kill you and no one would know."

118.    Plaintiff Rafiq Alhami was extensively interrogated.

119.    During interrogations, Plaintiff Rafiq Alhami was typically "long shackled":  his legs were chained to the floor by a large padlock. The shackles had sharp edges that scraped his skin, and Plaintiff experienced deep cuts on and around his ankles, resulting in scarring and

continuing chronic pain. Plaintiff Rafiq Alhami was repeatedly urged by American interrogators to admit that he was a fighter who went to Afghanistan for "jihad."

120. Plaintiff Rafiq Alhami had no privacy, and his cage provided little shelter from the heat during the day or from the cold at night.

121. Plaintiff Rafiq Alhami was placed in isolation. There was no explanation given to Plaintiff as to why he had been placed in isolation. Following this period, he was placed in a different cell and interrogated by mostly American interrogators who repeatedly asked him the same questions for six (6) months.

122. Plaintiff Rafiq Alhami was repeatedly "ERFed". ERF is the acronym for Emergency Response Force. Five (5) different soldiers would come into Plaintiff Rafiq Alhami's cage, each wearing a black plastic helmet, mask, black visor, black chest and back vests, arm and forearm shields, leg coverings, shoe coverings, and black plastic gloves. In addition, each person would be carrying a heavy black plastic shield that was approximately 5 feet tall. Donning this equipment, the Force would enter the cell, push Plaintiff Rafiq Alhami into a corner, use their weight on the shields to push Plaintiff to the floor, handcuff his hands behind his back, shackle his legs, and chain his hands and legs together so that he could shuffle but not walk. They he would be transported either to interrogations, to medical facilities for forced feeding, or to another camp.

123. Plaintiff Rafiq Alhami was beaten, forcibly injected, and chained in a "hog-tied" position. Plaintiff was deprived at various intervals of soap, toothpaste and toothbrush, blankets, and toilet paper. Sometimes, Plaintiff Rafiq Alhami was deprived of his Koran.

124.    Plaintiff Rafiq Alhami was denied the right to any other reading materials. He requested an Arabic-English dictionary, for instance, so that he could learn English, and it was refused.

125.    Defendants John Does punched him repeatedly in the face and kneed him in his thigh.

126.    Interrogation booths were outfitted with state of the art cameras, as well as with one-way glass windows. All of the interrogations of Plaintiff Rafiq Alhami and other detainees were recorded and are available as evidence of the veracity of Plaintiff allegations herein.

127.    Interrogators and guards frequently promised to provide or threatened to withdraw essential items such as blankets or toothpaste—referred to as "comfort items"—in order to coerce detainees into providing information. Plaintiff Rafiq Alhami's truthful assertion that he had no information to give did not result in the provision of "comfort items." To the contrary, the interrogators demanded that Plaintiff falsely confess and promised "comfort items" in exchange.

128.    Isolation of detainees was frequently used as a technique to "wear down" detainees prior to interrogation. There were two primary ways in which prisoners would be placed in isolation: (1) for punishment, for a set period of time for a specific reason; or (2) for interrogation, with no specific time limit.

### Interrogations at Guantánamo

129.    Between 2003 and August 2005, Plaintiff Rafiq Alhami was interrogated more times than he can count. Most of the interrogations involved the same questions that had been asked before.

31

130.    Because he believed that he would once again be subjected to the torture that forced him to "confess" at the CIA Dark Sites, he did not retract his confession until he appeared before his Combatant Status Review Tribunal ("CSRT").

### Mistreatment at Guantánamo

131.    As a result of the extreme cold to which Plaintiff Rafiq Alhami was exposed in Afghanistan, he was extremely vulnerable to cold temperatures and radical temperature changes. Yet, the temperature in his cell was constantly changed. During the day it was often kept very hot; at night the air conditioning was turned down to very cold.

132.    Plaintiff Rafiq Alhami was transferred to an isolation block called "Romeo" in Block Camp Five, where he was placed in a metal cell.  To make the conditions of his confinement continuously debilitating, the air conditioning was turned off during the day and turned on high at night.  As a result, temperatures were near 100 degrees during the day and only 40 degrees at night.  The extremes of heat and cold were deliberately utilized to intimidate, discomfort and break down prisoners.

133.    Plaintiff Rafiq Alhami was at one point taken to a room, "short shackled," and subjected to extremely cold temperatures for six (6) to seven (7) hours. (Short shackling consists of chaining the ankles and wrists closely together to force the detainee into a contorted and painful position.)  Plaintiff Rafiq Alhami was unable to move in the shackles and was not afforded any opportunity to go to the bathroom. He was hardly able to walk and suffered severe back pains. He was later taken back to his cell without explanation.

134.    Plaintiff Rafiq Alhami was again "short shackled" and chained to the floor for interrogations by a United States Army intelligence officer. During these interrogations, Plaintiff Rafiq Alhami was neither provided with food nor permitted to pray.

135.     Later, soldiers arrived at Plaintiff Rafiq Alhami's cell to transfer him to another block, where he would remain in isolation for another two (2) months without "comfort items." During this period, Plaintiff had no contact with any human being except for the guards and interrogators who questioned him regarding the identities of certain individuals in photographs. One of the individuals was Dilawar, the detainee who was killed in Bagram while being prepared for interrogation.

136.     Plaintiff Rafiq Alhami's requests to pray and to have food or water were denied. Later, Plaintiff was taken to what was, on information and belief, a CIA interrogation block.

137.     Plaintiff Rafiq Alhami continued to be held in the Romeo Block and was occasionally brought in for interrogation. The typical routine was for him first to be "short shackled" and placed in an extremely cold room with loud music for several hours.

138.     Before arriving at Guantánamo, Plaintiff Rafiq Alhami had been seriously sleep-deprived and malnourished, and at Guantánamo he simply repeated the same facts to which he had testified in Kabul and Bagram.

### Post-Boumediene *Mistreatment of Plaintiff at Guantánamo*

#### Denial of Medical Treatment

139.     Plaintiff Rafiq Alhami has suffered serious eye damage as a result of his mistreatment by Defendants. The symptoms of his eye injures include severe headaches, blurred vision, and an inability to read or even to see in normal light.

140.     Plaintiff Rafiq Alhami reported his conditions repeatedly, but received only "pain killers"—not treatment.

141.     After many requests, an eye doctor did finally arrive. The eye doctor's diagnosis was that Plaintiff Rafiq Alhami needed only glasses with a new prescription.

142.    Eight (8) months after this examination, the glasses arrived but Plaintiff Rafiq Alhami's condition persisted.  Plaintiff Rafiq Alhami's eyes continue to hurt so much that he cannot read legal mail and sometimes is in such pain that he has to reschedule legal visits.

143.    Without glasses, Plaintiff Rafiq Alhami suffers constant headaches.  Although bright lights cause him enormous pain, there continue to be bright lights in his cell around the clock.  There are three (3) large lights in each cell, along with one (1) smaller light, and the cell walls are painted a very bright white to reflect the intense light.

144.    Plaintiff Rafiq Alhami cannot sleep because the lights in his cell are too bright.

145.    As a result of the denial to Plaintiff Rafiq Alhami of proper medical care, and his constant exposure to extremely bright light, Plaintiff continues to experience great pain and discomfort, and believes that his eyes are deteriorating.

*Temperature Manipulation and Abuse of Vulnerability to Cold*

146.    Plaintiff Rafiq Alhami has become highly vulnerable to temperature.  As a result of the treatment he received in Kabul, and especially in the Prison of Darkness, he is extremely sensitive to temperature variation.

147.    From the beginning July 2008 until the present, the temperature in Plaintiff Rafiq Alhami's cell has varied widely.  At night, the air conditioner is turned on very high, and his cell is very cold.

148.    Sometimes his clothes are removed, leaving him naked in the cold.  This has happened more and more during September, October, November and December of 2008.

*Solitary Confinement*

149. Since July 2008, Plaintiff Rafiq Alhami has been placed in solitary confinement for many weeks. When so confined, he is alone in his cell, except that every two (2) days he is allowed out for a fifteen (15) minute walk. While in solitary confinement, Plaintiff Rafiq Alhami was able to see only one other individual—an Afghan, who Plaintiff believes has since been released.

*Assault*

150. Since July 2008, Plaintiff Rafiq Alhami has been beaten by guards with broomsticks.

151. Since July 2008, Plaintiff Rafiq Alhami has been ERF'd repeatedly: the Emergency Response Force has entered his cell, using all five (5) members of the force to push him to the floor, hold him down, and use shears to cut off all of his clothes.

152. Afterwards these assaults, Plaintiff Rafiq Alhami is left alone in a cold cell for hours. No reason has been given for the actions of the members of the Emergency Response Force.

*Sexual Abuse and Hemorrhoids*

153. Plaintiff Rafiq Alhami, like many other detainees and to his guards' knowledge, suffers from hemorrhoids. On more than one occasion since July 2008, Plaintiff's toilet paper has been sprayed with pepper spray so that when he uses it he is caused great pain and injury.

154. Additionally, on more than one occasion Plaintiff Rafiq Alhami and other detainees have had pepper spray shot at them from outside of their cells.

155.    On one occasion since July 2008, the guards deliberately sprayed pepper onto Plaintiff Rafiq Alhami's bare buttocks, greatly inflaming his hemorrhoids.

156.    Afterwards, the Emergency Response Force mocked Plaintiff Rafiq Alhami and laughed at his pain.

### Religious Abuse

157.    Since July 2008, Plaintiff Rafiq Alhami has been denied a prayer rug, a place to wash, and a Koran, and has been given no notification as to the time of day.  All of these actions prevented him from praying.

### Cover up

158.    The post- July 2008 abuses committed against Plaintiff Rafiq Alhami involving environmental manipulation, physical assault, sexual abuse, religious oppression, and withholding of medical treatment have been covered up.

159.    Not only have these events occurred, but military officials have been relieved of their duties as a result.  There is no doubt, therefore, that Defendants know that these events happened.  General Zanetti, upon being advised that war crimes were being committed upon Plaintiff Rafiq Alhami at Guantánamo, promised to investigate and get the details.  However, no details are forthcoming, and there is no indication an investigation has taken place.

160.    In addition to withholding the results of the Guantánamo investigation, if any, Defendants have censored Plaintiff Rafiq Alhami's attorney-client notes in order to keep relevant information from being revealed.

161.    Detainees who witnessed the assaults against Plaintiff Rafiq Alhami have described them to their counsel, who have recorded the information in notes.  Under the procedures that Defendants require for attorney-client access, however, the attorney notes cannot

be revealed until they are cleared by the Attorney Review Team. On Defendants' orders, the Attorney Review Team has refused to clear the notes.

162. This interference with attorney notes, in order to withhold reports of mistreatment from Plaintiff Rafiq Alhami and other detainees, violates the protective order. Such a cover-up attempt by Defendants is contempt of the court's order of protection as well as a denial of due process and Plaintiff Rafiq Alhami's right to counsel.

163. Defendants have also penetrated attorney-client privileged communications, for there is simply no way that Defendants could know of what was in the notes sufficient to prevent them from being released without having read them.

164. The only way that Defendants could have obtained that knowledge is if they had access to the contents of the attorney-client privileged communications between the detainees and their counsel.

### *Injuries*

165. Plaintiff Rafiq Alhami has suffered and continues to suffer from the cruel, inhuman and degrading treatment he has experienced during his detention. From frequent "short shackling," Plaintiff Rafiq Alhami has suffered deep cuts at his ankles, permanent scarring, and chronic pain. Plaintiff Rafiq Alhami also suffers from permanent deterioration to his eyesight.

166. Furthermore, Plaintiff Rafiq Alhami experiences chronic pain in his knees from having been repeatedly forced onto his knees and pressed downward by guards whenever he left his cell. He also has experienced pain in his right elbow.

167. Plaintiff Rafiq Alhami also suffers from acute psychological symptoms.

**Defendants' Plan of Torture and Other Physical and Psychological Mistreatment of Detainees**

168.    The torture, threats, and physical and psychological abuse inflicted upon Plaintiff Rafiq Alhami were devised, approved, and implemented by Defendant Rumsfeld and other Defendants in the military chain of command. These techniques were intended to be used on detainees as interrogation techniques.

169.    It is well-established that the use of force in interrogation is prohibited by both domestic and international law. The United States Army strictly prohibits the use of such techniques and advises its interrogators that their use may lead to criminal prosecution. Army Field Manual 34-52, Ch 1, "Intelligence Interrogation," provides:

Prohibition Against Use of Force

"The [First, Third, and Fourth Geneva Conventions], and U.S. policy expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment […] Such illegal acts are not authorized and will not be condoned by the U.S. Army. Acts in violation of these prohibitions are punishable under the UCMJ. [...] The psychological techniques and principles in this manual should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, physical or mental torture, or any other form of mental coercion[.]"

FM 34-52 (1992) pp. 1-8.

170.    Furthermore, according to Field Manual 34-52, Ch. 1: "Experience indicates the use of force is not necessary to gain the cooperation of sources for interrogation. Therefore, the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he things the interrogator wants to hear."

171.    In addition, Army Field Manual 2-22.3, which replaced Field Manual 34-52 in 2006, explicitly prohibits torture as well as cruel, inhuman and degrading treatment, regardless of status, in accordance with the Geneva Conventions and the Detainee Treatment Act of 2005. § 5-

74.    The Manual prohibits physical or mental coercion, and warns against confusion of permissible and impermissible methods. §§ 5-75, 76, 77. The Manual also states that:

> Acts of violence or intimidation, including physical or mental torture, or exposure to inhumane treatment as a means of or aid to interrogation are expressly prohibited. Acts in violation of these prohibitions may be a violation of U.S. law and regulation and the law of war, including the Geneva Conventions of 1949, and may be criminal acts punishable under UCMJ and U.S. law [...] The commander bears the responsibility to ensure that these activities are performed in accordance with applicable law, regulations, and policy.

FM 2-22.3, pp. 5-26.

172.    Army Field Manual 27-10, "The Law and Land Warfare," summarizes the domestic and international legal rules applicable to the conduct of war. Field Manual 27-10 recognizes the following sources of the law of war:

> a. *Lawmaking Treaties (or Conventions), such as the Hague and Geneva Conventions.*
> b. *Custom.* Although some of the law of war has not been incorporated in any treaty or convention to which the United States is a party, this body of unwritten or customary law is firmly established by the customs of nations and well defined by recognized authorities on international law.

173.    When conducted by members of the military, the acts described had the intent and the effect of violating Articles 78, 81, 92 93, 124, 128, 134, among others of the Uniform Code of Military Justice.

174.    In spite of the prohibitions on the use of force, threats, and abuse in the Army Field Manual, and in spite of the Manual's clear acknowledgement that their use violates international and domestic law, Defendant Rumsfeld approved techniques that were in violation of these prohibitions and thus knowingly violated the rights of Plaintiff Rafiq Alhami.

175.    In a press release dated June 22, 2004, Defendant Rumsfeld admitted that, beginning on December 2, 2002, he personally authorized the use of interrogation techniques that are not permitted under Field Manual 34-52. Furthermore, in the press release, Defendant

Rumsfeld admits that he personally was consulted when certain of the techniques were to be utilized.

176.    The techniques practiced on Plaintiff Rafiq Alhami —including beatings, "short shackling," sleep deprivation, injections of unknown substances, subjection to cold or heat, hooding, stress positions, isolation, disruption of religious practices, forced nakedness, and intimidation with vicious dogs and threats—were known to and approved by Defendant Rumsfeld and others in the military chain of command.

177.    Article 3 common to all four Geneva Conventions requires that all persons in the hand of an opposing force, regardless of their legal status, be afforded certain minimum standards of treatment:

> Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other causes, shall in all circumstances be treated humanely, without any adverse distinction founded on race, col[or], religion or faith, sex, birth or wealth, or any other similar criteria.

178.    To this end, the following acts are and shall remain prohibited at any times and in any place whatsoever with respect to the above-mentioned persons:

> (a) Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
>
> (b) Outrages upon personal dignity, in particular, humiliating and degrading treatment.

179.    The Third Geneva Convention of 1949, Art. 130, bars the "willful killing, torture, or inhuman treatment...willfully causing great suffering or serious injury to body or health" of any prisoner of war.

180.    In February 2002, the White House issued a directive, which advised:

> The United States is treating and will continue to treat all of the individuals detained at Guantánamo humanely and, to the extent appropriate and consistent

40

> with military necessity, in a manner consistent with the principles of the Third
> Geneva Convention of 1949.
>
> The President has determined that the Geneva Convention applies to the Taliban
> detainees, but not to the al-Qaeda detainees. Al-Qaeda is not a state party to the
> Geneva Convention: it is a foreign terrorist group. As such, its members are not
> entitled to POW status.

181.   Defendant Rumsfeld and all other Defendants knew of the Presidential Order.
Moreover, Defendant Rumsfeld knew that this statement of policy was a departure from the
previous policy of the United States that the laws of war, including the Geneva Conventions,
were always to be honored. Defendant Rumsfeld knew that the Department of State and the
uniformed services took the generally recognized position that the Geneva Conventions could
not be abrogated or ignored.

182.   However, Defendant Rumsfeld and others deliberately failed to implement the
Presidential Directive. Defendant Rumsfeld and other Defendants in the chain of command had
no good faith basis for believing that Plaintiff Rafiq Alhami was a member of or affiliated with
Al-Qaeda in any way. Indeed, Rumsfeld and the other Defendants had no way of knowing who
was and who was not a member of Al-Qaeda and Defendants took no steps to implement any
reliable fact-finding process which might ascertain who was and who was not a member of Al-
Qaeda, including in particular a "competent tribunal" as mandated not only by the Third Geneva
Convention, Art. 5, but also by United States military regulations and long standing practices of
the United States armed forces.

183.   Defendant Rumsfeld and all Defendants were aware that torture and other
mistreatment perpetrated under color of law violate domestic and international law.

184.    Defendant Rumsfeld and all Defendants knew or should have known that Plaintiff Rafiq Alhami was tortured and otherwise mistreated while in military custody in Afghanistan and at Guantánamo.

185.    Defendant Rumsfeld and all Defendants took no steps to prevent the infliction of torture and other mistreatment to which Plaintiff Rafiq Alhami was subjected.

186.    Defendant Rumsfeld and all Defendants authorized and encouraged the infliction of torture and other mistreatment against Plaintiff Rafiq Alhami.

187.    Defendant Rumsfeld and all Defendants were aware that prolonged arbitrary detention violates customary international law.

188.    Defendant Rumsfeld and all Defendants authorized and condoned the prolonged arbitrary detention of Plaintiff Rafiq Alhami.

## COUNT I

### ALIEN TORT STATUTE
### (Prolonged Arbitrary Detention)

189.    Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

190.    The Alien Tort Statute, 28 U.S.C. § 1350, accords jurisdiction to federal district courts "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

191.    The allegations constitute violations of the law of nations because the law of nations bars, *inter alia*, "prolonged arbitrary detention." The acts described herein constitute prolonged arbitrary detention in violation of the law of nations under 28 U.S.C. §1350 in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international

**

and domestic judicial decisions, and other authorities. E.g., Restatement (Third) of the Foreign Relations Law of the U.S., § 702.

192.    Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about, and failed to prevent, punish, or report the prolonged arbitrary detention of Plaintiff Rafiq Alhami.

193.    The allegations also constitute violations of the law of treaties of the United States, including, without limitation, Article 9 of the International Covenant on Civil and Political Rights (ICCPR), which provides that "no one shall be subjected to arbitrary arrest and detention." ICCPR, *opened for signature*, Dec. 19, 1966, 999 U.N.T.S. 171, 21 U.N. GAOR Supp. (No. 16) at 54; *entered into force* Mar. 23, 1976, at Art. 9(1); *ratified* by the United States Apr. 2, 1992, *see* 138 Cong. Rec. S4781-84.

194.    Plaintiff Rafiq Alhami was detained in an Iranian prison when Defendants took physical custody of his persons. Plaintiff never engaged in combat, carried arms, or participated in terrorist activity or conspired with a terrorist person or organization. Defendants could have had no good-faith reason to believe that he had done so. Plaintiff Rafiq Alhami was not taken into custody or detained in preparation for or in anticipation of legal action against him. Rather, he was detained for more than seven (7) years, and continues to be detained, without trial and in contravention of international norms which are specific, obligatory, and universal.

195.    Plaintiff Rafiq Alhami was detained under the exclusive custody and control of Defendants for years without due process, access to counsel or family, or having had a single charge of wrongdoing levied against him.

Case 2:09-cv-01917-DMC-MF   Document 1   Filed 04/23/09   Page 44 of 56 PageID: 44

196.     Defendants' unlawful conduct deprived Plaintiff Rafiq Alhami of his freedom, and of contact with his family, friends and community. As a result, Plaintiff Rafiq Alhami has suffered and continues to suffer severe psychological abuse and injury.

197.     Plaintiff Rafiq Alhami's are entitled to monetary damages and other relief to be determined at trial.

## COUNT II
## ALIEN TORT STATUTE
### Torture

198.     Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

199.     The Alien Tort statute, 28 U.S.C. § 1350, accords jurisdiction to federal district courts "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

200.     The allegations constitute violations of the law of nations because the law of nations bars, *inter alia*, torture or other cruel, inhuman, or degrading treatment or punishment. The acts described herein constitute torture or other cruel, inhuman, or degrading treatment or punishment in violation of the law of nations under 28 U.S.C. §1350 in that the acts violated customary international law prohibiting torture or other cruel, inhuman, or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities. E.g., Restatement (Third) of the Foreign Relations Law of the U.S., § 702.

201.     The allegations also constitute violations of the law of treaties of the United States, including, without limitation, the Third Geneva Convention Relative to the Treatment of Prisoners of War, ratified by the United States on Feb. 8, 1955, bars, inter alia "outrages against

personal dignity, including humiliating and degrading treatment." Art. 3; and the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, ratified by the United States on Oct. 21, 1994 bars the infliction of torture, inter alia, for the obtaining... information or a confession." Art. 1.

202.    The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing Plaintiff Rafiq Alhami or intimidating him. The alleged acts did not serve any legitimate intelligence-gathering or other government purpose. Instead, they were perpetrated to coerce, punish, and intimidate Plaintiff Rafiq Alhami.

203.    In any event, torture is not permitted as a legitimate government function under any circumstances.

204.    Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired together in bringing about, and failed to prevent, punish, or report the torture and other physical and psychological abuse of Plaintiff Rafiq Alhami as described above.

205.    Plaintiff Rafiq Alhami suffered severe, immediate and continuing physical and psychological abuse as a result of the acts alleged herein. Plaintiff continues to suffer profound physical and psychological trauma from the acts alleged herein.

206.    Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT III
## ALIEN TORT STATUTE
### Cruel, Inhuman or Degrading Treatment

207.    Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in through 186of this Complaint as if fully set forth herein.

208.     The acts described herein had the intent and the effect of grossly humiliating and debasing Plaintiff Rafiq Alhami, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical and moral resistance.

209.     These acts included, *inter alia,* frequent and severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; lack of basic hygiene; intentional exposure to extremes of heat and cold and the elements; continuous isolation for a period of months; forced injects; sexual humiliation; intimidation with un-muzzled dogs; deprivation of the rights to practice religion; and death threats.

210.     The Alien Tort statute, 28 U.S.C. § 1350, accords jurisdiction to federal district courts "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

211.     The allegations constitute violations of the law of nations because the law of nations bars, *inter alia*, cruel, inhuman, or degrading treatment or punishment.   The acts described herein constitute cruel, inhuman, or degrading treatment or punishment in violation of the law of nations under 28 U.S.C. §1350 in that the acts violated customary international law prohibiting cruel, inhuman, or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities. E.g., Restatement (Third) of the Foreign Relations Law of the U.S., § 702.

212.     The allegations also constitute violations of the law of treaties of the United States, including, without limitation, the Third Geneva Convention Relative to the Treatment of Prisoners of War, ratified by the United States on Feb. 8, 1955, bars, inter alia "outrages against personal dignity, including humiliating and degrading treatment." Art. 3; and the Convention

46

Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, ratified by the United States on Oct. 21, 1994 bars the infliction of cruel, inhuman or degrading treatment, *inter alia*, for the obtaining… information or a confession." Art. 1.

213. Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about, and failed to prevent, punish, or report the cruel, inhuman or degrading treatment of Plaintiff Rafiq Alhami as described above.

214. Plaintiff Rafiq Alhami suffered severe immediate physical and psychological abuse as a result of the acts alleged herein. Plaintiff continues to suffer profound physical and psychological trauma from the acts alleged herein.

215. Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT IV
## VIOLATION OF THE GENEVA CONVENTIONS

216. Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

217. As detailed herein, Plaintiff Rafiq Alhami was held arbitrarily, tortured, and otherwise mistreated during his detention in violation of specific protections of the Third and Fourth Geneva Conventions including but not limited to Article 3 common to all four Geneva Conventions.

218. Violations of the Geneva Conventions are direct treaty violations as well as violations of customary international law.

219. Defendants are liable for said conduct in that Defendants participated, in set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified,

47

aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, torture, abuse and mistreatment of Plaintiff Rafiq Alhami as described above.

220.     As a result of Defendants' violations of the Geneva Conventions, Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT V
## CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES
## EIGHTH AMENDMENT

221.     Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

222.     Defendants' actions alleged herein against imprisoned Plaintiff Rafiq Alhami violated the Eight Amendment to the United States Constitution.

223.     Over the course of an arbitrary and baseless incarceration spanning years, Defendants inflicted cruel and unusual punishment on Plaintiff Rafiq Alhami. Despite never having been tried by any tribunal, Plaintiff Rafiq Alhami and other detainees were repeatedly denounced as guilty of terrorist acts by Defendant Rumsfeld, President Bush, Vice President Cheney and others. The acts of cruel, inhuman or degrading and unusual punishment were imposed based on this arbitrary and impermissible declaration of guilt.

224.     Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

225.     Plaintiff Rafiq Alhami suffered severe physical and mental injuries as a result of Defendants' violations of the Eight Amendment. He has also suffered present and future economic damages.

226.     The actions of Defendants are actionable under *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).

227.    Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Plaintiff Rafiq Alhami as described above.

228.    Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT VI
## CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES
## FIFTH AMENDMENT

229.    Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

230.    Defendants' actions alleged herein against Plaintiff Rafiq Alhami violated the Fifth Amendment to the United States Constitution.

231.    The continuing, arbitrary and baseless detention of Plaintiff Rafiq Alhami for a period of years constitutes a clear deprivation of his liberty without due process, in direct violation of his Fifth Amendment rights.

232.    The cruel, inhuman, degrading, and unusual conditions of Plaintiff Rafiq Alhami's incarceration clearly violate his substantive rights to due process. See *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

233.    Defendants' refusal to permit Plaintiff Rafiq Alhami to consult freely with counsel or to have access to neutral tribunals to challenge the fact and conditions of his confinement constitutes violations of Plaintiff Rafiq Alhami's procedural rights to due process.

234. The abusive conditions of Plaintiff Rafiq Alhami's incarceration served no legitimate government purpose.

235. Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

236. Plaintiff Rafiq Alhami suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment. He has also suffered present and future economic damage.

237. The actions of Defendants are actionable under *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).

238. Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Plaintiff Rafiq Alhami as described above.

239. Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT VII

## VIOLATION OF THE LAW OF NATIONS
### Torture

240. Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

241. As detailed herein, Plaintiff Rafiq Alhami was held arbitrarily, tortured and otherwise mistreated during his detention in violation of the core principles of customary international law known as "the law of nations," which are embodied in many documents that the

United States has signed and ratified, including the United Nations Convention Against Torture or Other Cruel, Inhumane or Degrading Treatment of Punishment ("Convention Against Torture"), Art. 2(2), Dec. 10 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (ratified by the United States on Oct. 21, 1994), and the International Covenant on Civil and Political Rights ("ICCPR"), Art. 7, Dec. 16, 1966, 999 U.N.T.S. 171 (ratified by the United States on June 8, 1992).

242.    The ICCPR requires that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. Art. 7, Dec. 16, 1966, 999 U.N.T.S. 171. The Convention against Torture is aimed at strengthening existing prohibitions on torture through specific policies.

243.    The prohibition against torture is a "specific, universal and obligatory" norm, from which no exceptions are allowed, "whether a state of war or threat of war, internal political instability or any other public emergency." Convention Against Torture, *supra*, Art. 2(2) Dec. 10 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. This strict adherence is tied to the prohibition of torture by nations committed to upholding fundamental human rights, and support of this strict interpretation has been expressly communicated by the United States. Committee against Torture, Consideration of Reports Submitted by States Parties Under Article 19 of the Convention: United States of America (October 15, 1999) U.S. Doc CAR/A/28/Add.5 (2000), at ¶ 6.

244.    The Law of Nations provides a "clear and unambiguous" prohibition against torture, and does not make any distinction between the treatment of aliens and citizens. *Antolok v. United States,* 873 F.2d 369 (D.C. Cir. 1989). United States courts have enforced this prohibition against torture, consistently recognizing that the prohibition is universal, obligatory,

51

and specific. *Filartiga v. Pena-Irala,* 630 F.2d 876, 880 (2d Cir. 1980); See also *Doe v. Islamic Salvation Front,* 993 F. Supp. 3, 8 (D.D.C. 1998) (declaring that both international and United States law prohibit torture).

245.    The Convention defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1251-1252 (11th Cir. Fla. 2005) (*cf.* Convention Against Torture (1984)).

246.    Defendants are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, torture, abuse and mistreatment of Plaintiff Rafiq Alhami as described above.

247.    Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT VIII

### CLAIMS UNDER THE RELIGIOUS FREEDOM RESTORATION ACT

248.    Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

249.    The individual defendants' actions alleged herein inhibited and constrained religiously motivated conduct central to Plaintiff Rafiq Alhami's religious beliefs.

250.    The individual defendants' actions thereby imposed a substantial burden on Plaintiff Rafiq Alhami's abilities to exercise and express his religious beliefs.

251.    The individual defendants regularly and systematically engaged in practices specifically aimed at disrupting Plaintiff Rafiq Alhami's religious practices.  These acts included throwing a copy of the Koran in a toilet bucket, prohibiting prayer, deliberately interrupting prayers, playing loud rock music to interrupt prayers, withholding the Koran without reason or as punishment, forcing prisoners to pray with exposed genital areas, withholding prayer mats and confining Plaintiff Rafiq Alhami under conditions where it was impossible for him to practice his religion.

252.    The individual defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

253.    Plaintiff Rafiq Alhami suffered damages as a direct and proximate result of the individual defendants' actions.

254.    The Religious Freedom Restoration Act, 42 U.S.C.A. §§ 2000bb et seq. (RFRA), authorizes suit against the Government of the United States by providing that "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim . . . in a judicial proceeding and obtain appropriate relief against a government." §2000bb-1.

255.    Under RFRA, "the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." §2000bb-2(1).

256. According, each of the individual defendants is responsible to plaintiff Rafiq Alhami for his or her violations of RFRA.

257. Further, the United States Department of Defense is liable for the violations of its agents acting under color law.

258. Further, the United States is responsible for the conduct of the individual defendants and the Department of Defense for their actions under color of law because it is a "government" within the meaning of RFRA.

259. The Department of Defense and the United States are also responsible for the actions of the individual defendants because the actions of lower level individual defendants were the result of actions of the United States and/or of higher level officials of the United States who participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the denial, disruption and interference with Plaintiff Rafiq Alhami's religious practices and beliefs as described above.

260. For the RFRA violations, plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

## COUNT IX
## VIOLATION OF THE LAW OF NATIONS
## (COMMAND RESPONSIBILITY)

261. Plaintiff Rafiq Alhami repeats and re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

262. As detailed herein, Plaintiff Rafiq Alhami was held arbitrarily, tortured and otherwise mistreated during his detention in violation of the core principles of customary

international law, also known as "the law of nations," which imposes liability on commanding officers for the acts of their subordinates.

263.    A commanding officer is liable for the acts of his or her subordinates if the commanding officer knows of a substantial likelihood that torture or other cruel, inhuman or degrading treatment will result from the execution of an order from the commander. The international law doctrine of "command responsibility," embodied in the Fourth Hague Convention of 1907, has been recognized by the United States Supreme Court as imposing such liability on military commanders for the acts of their subordinates. *Hamdan v. Rumsfeld*, 548 U.S. 557, 604 (2006) (discussing *In re Yamashita*, 327 U.S. 1 (1946).

264.    Defendants, as commanding officers, are liable for said conduct in that Defendants participated in, set the conditions for, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, torture, abuse and mistreatment of Plaintiff Rafiq Alhami as described above and as contained in Count I through Count VII.

265.    Plaintiff Rafiq Alhami is entitled to monetary damages and other relief to be determined at trial.

WHEREFORE Plaintiff Rafiq Alhami demands judgment against Defendant United States of America in the amount of $9,999.00 and against all other Defendants jointly and severally, including compensatory damages in the amount of $10,000,000 (Ten Million Dollars), punitive damages, the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper.

April 23, 2009                                    DENBEAUX & DENBEAUX

                                                        /s/
                                              By: _____
                                              Joshua W. Denbeaux, Esq. (JD7849)
                                              Denbeaux & Denbeaux
                                              366 Kinderkamack Road
                                              Westwood, NJ  07675
                                              (201) 664-8855

                                              ATTORNEYS FOR PLAINTIFF


                                              Charles A. Sullivan, Esq. (CS2779)
                                              One Newark Center
                                              Newark, NJ 07102
                                              (973) 642-8870

                                              CO-COUNSEL FOR PLAINTIFF